## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| | CIVIL ACTION NO.: |
| RAFAEL CASASNOVAS CORTES | |
| **PLAINTIFF** | RESPA DAMAGES, DECLARATORY JUDGMENT & INJUNCTIVE RELIEVE |
| V. | |
| APEX BANK, BUREAU OF ALTERNATIVE METHODS, HON. SIGFRIDO STEIDEL FIGUEROA, HON. MAITE D. ORONOZ RODRÍGUEZ | JURY TRIAL DEMANDED |
| **DEFENDANTS** | |

# COMPLAINT

**COMES NOW**, Plaintiff, Rafael Casasnovas Cortes, by and through his undersigned counsel, and for his Complaint against Defendant APEX BANK and hereby states and alleges as follows:

### A.  Introduction

This action arises from Defendants, Apex Bank's ("Apex"), blatant disregard for federal law governing mortgage servicing transparency and borrower rights (in pure violation and complete disregard of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., and its implementing regulation, Regulation X). Apex repeatedly and unlawfully has refused to respond to Qualified Written Requests ("QWR's") be it Request for Information ("RFI") and/or Notices of Error (NOE) submitted by Plaintiff Rafael Casasnovas Cortes. These requests are aimed at obtaining critical information about his mortgage loan, including payment history, servicing practices, and loss mitigation evaluations.

Regardless of the rule of law, rather than comply with its clear duties under federal law, Apex chose to stonewall, defendants RFI. Apex knowingly has invoked irrelevant and inapplicable defenses, such

as state court litigation and mediation confidentiality, to justify withholding loan information that RESPA expressly requires Apex to disclose. Defendant knows or should know that federal law does not yield to state rules (moreover an internal regulation for mediation).[1] Apex's reliance on Puerto Rico's mediation confidentiality to avoid its federal obligations represents a direct challenge to the Supremacy Clause of the U.S. Constitution and undermines the core consumer protection purposes of RESPA.

Apex's actions were not isolated. Over the course of several months, Plaintiff submitted multiple well-founded QWRs seeking information essential to protecting his rights and his home. Apex responded with delay, evasion, subterfuge and ultimately refusal. As a result, Plaintiff has been deprived of vital loan data, preventing him from understanding or contesting Apex's servicing decisions, and materially hindered in his ability to defend against foreclosure and seeking *loss mitigation* options.

Through this complaint, Plaintiff seeks to hold Apex Bank accountable under federal law—its failure to respond to QWR's, its failure to correct servicing errors, its pattern of noncompliance, and its unconstitutional invocation of state law to avoid RESPA's federal mandates. Plaintiff seeks actual damages, statutory damages, declaratory and injunctive relief, and a jury trial to remedy these violations and prevent continued abuse of homeowners' rights under federal mortgage servicing law.

**B. Jurisdiction and Venue**

1. This is a civil action arising under the laws of the United States, specifically the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., and its implementing regulations (Regulation X, 12 C.F.R. § 1024). Accordingly, this Court has <u>federal question jurisdiction</u> pursuant to 28 U.S.C. § 1331.

---

[1] The official translation has been requested (and is pending). Plaintiff has joined to the present complaint the internal regulation in its original version (Spanish).

2. RESPA's jurisdictional provision, 12 U.S.C. §2614, expressly provides that actions for violations of 12 U.S.C. §2605 (such as those alleged here) may be brought in the United States District Court for the district in which the property is located or where the violation occurred. The property that is the subject of the mortgage loan at issue is in Puerto Rico, and the alleged violations occurred in Puerto Rico. Venue is therefore proper in this District under 28 U.S.C. § 1391 and 12 U.S.C. § 2614.

3. Additionally, Defendant Apex Bank conducts business in Puerto Rico, including the servicing of mortgage loans, and a substantial part of the events or omissions giving rise to the claims occurred in this District. The Court has personal jurisdiction over Apex Bank for these reasons.

### C. Parties

4. Plaintiff Rafael Casasnovas Cortes is a natural person and resident of Puerto Rico. He is the mortgagor on a federally related mortgage loan secured by his principal residence in Puerto Rico. At all times relevant, Plaintiff was a "borrower" and "consumer" entitled to the protections of RESPA and Regulation X. Mr. Casasnovas address is: Sol 257 Apt. 4 Castillo del Sol, San Juan, P.R. 00901

5. Defendant Apex Bank is a banking institution and mortgage lender/servicer. Apex Bank conducts mortgage lending and loan servicing operations in Puerto Rico and elsewhere. Apex Bank serviced Plaintiff's mortgage loan and, in that capacity, is a "servicer" as defined by 12 U.S.C. § 2605(i)(2), responsible for receiving loan payments and handling other servicing matters. Apex Bank is subject to the requirements of RESPA and Regulation X in its servicing of Plaintiff's loan. Apex know address is: Sherrill Blvd., Suite 200, Knoxville, TN 37932.

6. The Hon. Sigfrido Steidel Figueroa is and has been, at all material times to this action, the Puerto Rico Court Administrator. He is being sued exclusively in his official capacity. And is only being sued due to the constitutional challenge of the statute.

7. The Bureau of Alternative Methods & Hon. Maite D. Oronoz Rodríguez is the Chief Justice of the Supreme Court of Puerto Rico. As such, she is responsible for the Bureau of Alternative Methods

(Negociado de Métodos Alternos). Justice Oronoz Rodríguez is included in this action solely in regard to the Bureau being under her office as head of the Puerto Rico Judiciary and not in connection with any of her judicial functions as Chief Justice of the Puerto Rico Supreme Court. And is only being sued due to the constitutional challenge of the statute.

8. At all relevant times, Apex Bank was engaged in the servicing of Plaintiff's mortgage loan and acted through its officers, employees, agents, and representatives.

### D. Factual Background

9. Plaintiff Rafael Casasnovas Cortés is the owner of a home in Puerto Rico, on Castillo de Sol Apt. 4A San Juan, P.R. 00901, that is subject to a mortgage loan originally made for personal, family, or household purposes. Apex Bank is the alleged current holder and/or servicer of this loan. After Plaintiff experienced financial hardship, Apex Bank appeared in a foreclosure action filed by an alleged previous holder, against the plaintiff and Plaintiff's property in the Puerto Rico Court of First Instance of San Juan (a Commonwealth court), case civil no. K CD2016-0616.

10. In accordance with Puerto Rico law (the "Principal Residence Protection and Mandatory Mediation in Foreclosure Proceedings Act," Act 184-2012), the foreclosure proceeding was referred to a mandatory mediation process. This court-supervised mediation was intended to explore loss mitigation options (such as loan modifications or other foreclosure alternatives) and is governed by confidentiality rules under Puerto Rico law, meaning communications and documents from the mediation generally cannot be disclosed outside that process.

11. Notwithstanding the above, the process requires that Apex Bank's loss Mitigation personnel, that are not directly involved in the mediation process such as underwriters, to receive and evaluate the loss mitigation documents submitted by the Plaintiff.

12. The loss mitigation evaluation conducted by Apex Bank as part of the mandatory mediation process concluded with the servicer denying a loan modification. In connection with that denial, Apex Bank

failed to provide Plaintiff with notice of his right to appeal. Additionally, Apex Bank did not disclose any specific or pertinent reason for the denial.

13. Plaintiff tried to use the local discovery rule to obtain the information needed to dispute Apex determination of loan modification denial, but the court held that the information was not discoverable due to the confidentiality that ruled the compulsory mediation process.

14. Therefore, in a separate effort, <u>independent of the foreclosure litigation</u>,[2] Plaintiff sought information about the handling of his loan from Apex Bank by submitting multiple QWR's under RESPA. On April 1st, 2025; May 1st, 2025 and June 10th 2025, Plaintiff sent Apex formal QWR's pursuant to 12 U.S.C. § 2605(e). Each such correspondence included the name and account number of the borrower and described the information being sought regarding the servicing of the loan, thereby meeting the statutory definition of a QWR. The QWR's were mailed to the exclusive address designated by Apex for receipt of borrower inquiries, or otherwise to Apex's business address, in compliance with Regulation X.

15. In these QWR letters[3], Plaintiff requested necessary information related to the servicing of his loan, including but not limited to:

    a. Loan Payment History and Calculations: A complete transactional history of the loan (showing all payments received, how they were applied to principal, interest, escrow, and fees) and an explanation of the current loan balance calculation, including the application of any additional principal prepayments or charges. Plaintiff sought documentation to understand whether payments had been properly credited and how any arrearages or fees were computed.

---

[2] ("Nothing in these statutory provisions excuses a loan servicer from fullfiling its obligation thereunder, including the availability of discovery in litigation or a prior response to a CFPB complaint."); Lucero v. Cenlar 2015 WL 5024047 (W.D. Was Aug. 25, 2015) (borrower are not precluded from utilizing §§ 1024.35 and 1024.36 after litigation has initiated); Chatman v. Fairbank Capital Corp., 2002 WL 1338492 (N.D. Ill. June 13, 2002) (rejecting servicer's argument that plaintiff's QWR was "litigation strategy" and that the information requested **was subject to Federal Rules of Civil Procedure**).

[3] For all QWR the official translation has been requested (and is pending). Plaintiff has joined to the present complaint the contract in its original version (Spanish).

b. Loss Mitigation and Foreclosure Avoidance: All information related to any evaluations of Plaintiff for loss mitigation options (such as loan modifications or other foreclosure alternatives). This included any net present value (NPV) analyses, income calculations, or criteria used by Apex to grant or deny a loan modification. Plaintiff also requested copies of any notices or communications about loss mitigation sent pursuant to 12 C.F.R. § 1024.39 (early intervention) or § 1024.41 (loss mitigation procedures), and any internal notes or guidelines used by Apex in reviewing Plaintiff's requests for assistance.

c. Servicing Policies and Practices: Documents reflecting Apex's policies, procedures, or practices in servicing loans of this type, especially relating to how payments are handled when a loan is delinquent or in foreclosure, how fees and escrow are managed, and how information is shared (or not shared) during foreclosure mediation. Plaintiff inquired into whether Apex's servicing practices were consistent with federal requirements and sought any internal guidelines that might shed light on Apex's handling of his loan.

d. Communications and Records: Copies of all communications or notices sent to Plaintiff regarding the loan (including default notices, monthly mortgage statements, escrow analyses, and any force-placed insurance notices), as well as records of communications between Apex and any other entities regarding Plaintiff's loan. Plaintiff also requested identification of the owner or assignee of the loan (if different from Apex), which servicers are specifically required to provide upon request.

16. These categories of information all relate directly to the servicing of Plaintiff's mortgage loan account and were therefore proper subjects of a RESPA, RFI. By making these requests in writing, Plaintiff invoked Apex's duty under RESPA and Regulation X to conduct a reasonable investigation and provide the requested information or explain why it could not be provided.

17. Apex Bank responded to Plaintiff's QWR's,[4] but its responses were limited and not compliant with the requirements of federal law. In some instances, Apex provided a brief acknowledgement of receipt of the request (as required within 5 business days) and sent a written response within roughly 30 business days, as the timeline under RESPA generally requires. However, Apex failed to provide many of the documents and information, Plaintiff requested. Instead of a full and substantive response, Apex reply letters refused to produce significant categories of the requested information. Apex responses, in relevant part, denied or declined the RFI, offering a handful of justifications:

   a. Apex stated that because there was an ongoing foreclosure lawsuit and mediation in Puerto Rico's courts involving Plaintiff's loan, it was not required to provide certain information outside of that litigation. Apex took the position that Plaintiff's requests were improper or "duplicative" of discovery in the foreclosure case and that Apex should not have to respond through a RESPA inquiry while litigation was pending. Apex invoked 12 C.F.R. § 1024.36(f) and claimed that the requests sought information that had either already been asked and answered, or that Plaintiff should obtain through the court process, implying the requests were duplicative or overly broad.

   b. Apex further asserted that many of the documents and data Plaintiff sought were protected by the confidentiality of Puerto Rico's mandatory mediation process. Because loss mitigation discussions and documents exchanged during the court-ordered mediation are generally confidential under Puerto Rico law, Apex refused to provide those materials in response to the QWR's. For example, Apex would not turn over internal loss mitigation evaluations or communications from the mediation on the ground that such disclosure would violate the mediation confidentiality rules. In essence, Apex argued that Puerto Rico's state-law confidentiality provisions prohibited it from releasing certain information about Plaintiff's loan and foreclosure alternatives (regardless of RESPA's supremacy).

---

[4] Responded on April 29, 2025, June 2nd, 2025 and July 1st, 2025

c.  Apex also characterized several of Plaintiff's requests as "not directly related" to the servicing of the loan (i.e. irrelevant) under Regulation X. Apex balked at providing general "servicing policies and procedures" or broad categories of documents, claiming that those requests did not relate to Plaintiff's specific account or were beyond the scope of what RESPA requires. Apex cited 12 C.F.R. § 1024.36(f)(1)(iii), which allows a servicer to avoid responding to requests for irrelevant information (defined as information not directly related to the borrower's account). Apex contended that some requested items fell under this irrelevant category, and thus it did not furnish them.

18. These excuses correspond to a few narrow exceptions permitted by Regulation X for not responding to information requests – namely, if a request is duplicative, seeks confidential or privileged information, or is not relevant to the loan account. However, as detailed below, Apex's reliance on these exceptions was misplaced and unlawful under the circumstances. Notably, RESPA and Regulation X do not contain any blanket exception that relieves a servicer from responding to a QWR simply because a foreclosure lawsuit is pending or because information was shared in mediation. Apex's broad refusal to provide information on those grounds exceeded the limited scope of permissible exceptions in the regulation.

19. In its responses, Apex Bank also failed to address or correct the servicing errors that Plaintiff had pointed out. Apex did not acknowledge any wrongdoing in how it handled the RFI's. his fell short of RESPA's requirement that the servicer, after investigation, either make appropriate corrections to the account or provide the borrower with a written explanation of why the account is already correct. In sum, Apex did not comply with the error resolution procedures mandated by 12 C.F.R. § 1024.35.

20. At all times, Plaintiff's QWRs were sent for the purpose of obtaining information about the loan's servicing independently of any discovery in the foreclosure action. In other words, Plaintiff was exercising his rights under federal law to get information from his servicer, separate and apart from the state court litigation, relying on the federal statues and regulations. The QWR's were not issued

by the state court, nor were they part of any formal discovery process; they were private letters invoking federal law obligations. The information sought — such as payment histories and servicing records — was information that Plaintiff, as the borrower, is entitled to obtain from his servicer under RESPA. The fact that related litigation was ongoing did not diminish Apex's duties under federal law. Nothing in RESPA or Regulation X suspends a servicer's QWR response obligations merely because a foreclosure or mediation is in progress. To the contrary, federal regulations explicitly list the only exceptions that allow a servicer not to respond, and being in litigation is not one of those exceptions.

21. Therefore, Apex's refusal to provide information on the grounds of the pending foreclosure case was unlawful and contrary to RESPA.

22. Apex Bank's failure to fully respond to the QWR's and to correct servicing errors has caused real harm to Plaintiff. As a direct result of Apex's non-compliance:

   a. **Lost Information and Hindered Defense:** Plaintiff was deprived of crucial information regarding his mortgage loan, which hindered his ability to understand, challenge, or correct Apex's servicing actions. Without a complete payment history, loan calculation and loss mitigation final determination information, Plaintiff struggled to verify the amount allegedly owed or identify accounting and loss mitigation evaluation mistakes. Without the loss mitigation data and servicing policies, Plaintiff could not ascertain whether Apex properly evaluated him for a loan modification or other relief. This lack of information impeded Plaintiff's ability to formulate defenses in the foreclosure case and to seek alternatives to foreclosure. In short, Apex's non-responsiveness frustrated Plaintiff's efforts to save his home from foreclosure by keeping him in the dark about key facts.

   b. **Out-of-Pocket Expenses:** Plaintiff incurred expenses in preparing and sending the QWR's, including postage costs, copying costs, and reasonable attorney's fees paid for assistance in drafting the inquiries. These costs were unnecessarily expended due to Apex's

failure to comply with the law and provide the information upon request, forcing Plaintiff to repeatedly follow up and ultimately to initiate this action to obtain relief.

c. **Emotional Distress:** Apex's stonewalling and obfuscation have caused Plaintiff significant stress, frustration, and anxiety. Facing the possibility of losing his home, Plaintiff suffered emotional distress exacerbated by Apex's refusal to provide answers or transparency. The uncertainty about his loan status and the feeling that Apex was not following the law or treating him fairly led to sleeplessness, anxiety, and mental anguish for Plaintiff. These are real damages that flow from being deprived of rights Congress afforded borrowers under RESPA – rights designed to alleviate the exact kind of fear and confusion Plaintiff experienced.

d. **Continued Foreclosure Proceedings:** By failing to correct the servicing errors or provide information that might have led to a resolution, Apex's noncompliance allowed the foreclosure process to march forward under false or disputed pretenses. For example, had Apex properly credited all of Plaintiff's payments and removed improper fees, the delinquency amount might have been lower or cured, potentially avoiding foreclosure. Apex's failures thus materially contributed to Plaintiff's risk of losing his home.

e. **Pattern or Practice of Noncompliance:** Apex Bank's conduct as described was not an isolated oversight, but part of a pattern or practice of noncompliance with RESPA's servicing requirements. Apex did not just fail to respond properly to one request – it repeatedly refused to provide information and comply with its duties across multiple QWR's submitted by Plaintiff. In each instance, Apex gave similar non-compliant responses, indicating a deliberate policy or practice of avoiding its RESPA obligations (especially in the context of loans in foreclosure or mediation). The consistency of Apex's non-responses and blanket objections demonstrates a pattern or practice of resistance to the requirements of 12 U.S.C. §2605 and Regulation X. Under RESPA, such a pattern of

noncompliance subjects Apex to enhanced statutory damages (in addition to Plaintiff's actual damages).

23. All conditions precedent to the bringing of this action have been satisfied, performed, or waived. Plaintiff has afforded Apex Bank the time and opportunity to cure its failures as contemplated by RESPA's timelines, yet Apex's violations remain unsolved. Plaintiff now brings this action, as his last and only option, to enforce his rights under federal law.

### A. Count I – Violation of RESPA, 12 U.S.C. § 2605(e) (Failure to Respond Properly to QWR's)

24. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

25. Section 6 of RESPA, 12 U.S.C. § 2605, imposes a duty on loan servicer to respond to borrower inquiries. When a borrower submits a QWR relating to the servicing of a loan, the servicer must acknowledge receipt within 5 business days and, within 30 business days, provide a substantive response. The statute requires the servicer to:

(A) make any appropriate corrections to the account and notify the borrower, or

(B) after conducting an investigation, provide the borrower with a written explanation that either states why the servicer believes the account is correct or provides the information requested (or an explanation of why the requested information is unavailable). In every case, the servicer's response must include the name and contact information of someone who can assist the borrower further.

26. Plaintiff's written communications to Apex Bank were QWR's that triggered these statutory obligations. Apex, however, failed to comply with 12 U.S.C. § 2605(e) in multiple respects. Rather than provide the requested information or correct the account errors, Apex sent incomplete and evasive responses. Apex did not supply many of the specific documents and data that Plaintiff had asked for, nor did it correct the errors in Plaintiff's account. Moreover, Apex's letters did not adequately explain why the requested information could not be obtained – instead, Apex

improperly cited reasons like "confidentiality" and "ongoing litigation," which are not valid bases under the federal statute to withhold information. In short, Apex did not take the required actions in response to Plaintiff's QWRs: Apex neither made the appropriate corrections to the loan account nor conducted a good-faith investigation resulting in a legitimate explanation and provision of the information sought. By failing to do so, Apex violated 12 U.S.C. § 2605(e)(2).

27. Apex further violated RESPA by not fully acknowledging and addressing two (2) Notices of Error sent by Plaintiff. Under 12 U.S.C. § 2605(e)(2), upon receipt of a QWR that alleges an error, the servicer must either correct the error or explain why no error occurred, in writing. Apex's responses gave no meaningful explanation or correction regarding the errors Plaintiff raised This omission is another facet of Apex's failure to comply with § 2605(e).

28. To the extent Apex believed it had grounds not to produce certain information, those grounds are not recognized by RESPA. The statute does not list any exception for information being part of litigation or subject to state mediation privilege. Apex's reliance on such excuses means that Apex did not provide an explanation recognized by law for unavailability of the information. "Information unavailable or cannot be obtained by the servicer" refers to situations like the servicer not having the data after a reasonable search, not to a servicer simply choosing to withhold information for strategic or legal reasons. Apex's responses, therefore, did not meet the statutory standard of a lawful explanation.

29. Apex's violation of 12 U.S.C. § 2605(e) caused Plaintiff to suffer actual damages as detailed above, including but not limited to: (a) the costs of sending the QWR's and seeking information (postage, copying, and attorney's fees expended before litigation); (b) emotional distress and mental anguish; (c) lost opportunities to mitigate his loss or avoid further fees due to lack of information; and (d) other economic losses resulting from Apex's failure to correct account errors (such as continued accrual of improper fees or interest). These damages were directly and proximately caused by Apex's failure to comply with RESPA's requirements.

30. Furthermore, Apex's conduct constitutes a pattern or practice of noncompliance with the requirements of § 2605. Apex refused to properly respond to multiple QWR's from Plaintiff in a similar manner, indicating a systematic disregard for RESPA's mandates. Pursuant to 12 U.S.C. § 2605(f)(1)(B), Plaintiff is entitled to recover additional statutory damages because of this pattern or practice, in an amount to be determined by the Court up to $2,000 for each such failure.

31. RESPA provides that a prevailing borrower in an action under §2605 is entitled to recover costs and reasonable attorneys' fees. As a result of Apex's violations, Plaintiff has had to obtain legal counsel and incur attorneys' fees to enforce his rights. Plaintiff seeks recovery of these fees and costs under 12 U.S.C. § 2605(f)(3) as part of his relief.

**B. Count II – Violation of Regulation X, 12 C.F.R. § 1024.36 (Failure to Respond to RFI)**

32. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

33. Regulation X, at 12 C.F.R. § 1024.36, implements RESPA's requirements for a servicer's response to a borrower's request for information. Under § 1024.36, when a servicer receives a written information request from a borrower relating to the servicing of the loan (including a RFI), the servicer must respond within the prescribed time frames. The response must either: (i) provide the borrower with the requested information and contact information of someone for further assistance, or (ii) conduct a reasonable search for the information and provide a written notification stating that the requested information is not available to the servicer, with an explanation of the basis for that determination. The general time limit for responding is 30 business days, with a possible 15-day extension for good cause (if the borrower is notified of the extension), except that certain simple requests (like identifying the loan owner) must be answered within 10 business days. Additionally, §1024.36(c) requires the servicer to acknowledge receipt of the information request within 5 business days.

34. Mr. Casasnovas on the first of April 2025 (Exhibit 1) sent his first **ever** request via certified mail with request for receipt to Apex. It must be stated, Mr. Casasnovas before this date had never sent a QWR. On said document, Mr. Casasnovas requested:

    a. Information of del legitimate holder of the note.

    b. Information of servicer of the note.

    c. Information regarding the securitization of the note (if it was) and asked to identify the trust, REMIC, SPV of the note holder.

    d. Information of the transfer or sale of the note from Oriental to Apex.

    e. The date that Oriental acquired the servicing of the account and who was the holder of the note.

    f. The loss mitigation file for the evaluation done to Mr. Casasnovas on August and November 2022.

    g. All documents that contained or set forth the minimum requirements for the approval of a loan modification for Mr. Casasnovas loan that were used for the determination of loss mitigation done on August 2022 and November 2022.

    h. To provide a detailed list of all loss mitigation alternatives that Apex offered during the period from August 2022 to November 2022, detailing which of those alternatives, Mr. Casasnovas was considered for and for which ones he wasn't. We also requested that Apex explain determined not to consider Mr. Casasnovas for the alternatives for which he was not considered.

    i. Copy of the requirements for approval of all loss mitigation alternatives that Apex offered from August 2022 and November 2022.

    j. Copy of all the calculus, evaluations, analysis or another method of evaluation that Apex employed for the evaluation of Mr. Casasnovas loan done between August 2022 and November 2022 that were done to sustain and reach the loss mitigation determination.

k.  We requested they number and explain the reason, basis and analysis that were reached to deny the retention alternatives for Mr. Casasnovas loan.

l.  A cancelation balance for the loan up to the 30th of April 2025.

m.  A reinstallation balance for the loan on the date of February 15, 2023.

n.  It was also requested the following documents:

   i.  Copy of the note and any modification agreement of said note (if there was);

   ii.  Payment history of the entire loan;

   iii.  Copy of the monthly statements of the loan sent to Mr. Casasnovas;

   iv.  Copy of all note transfers sent to Mr. Casasnovas regarding the assignment of the note or administration;

   v.  Letter of the loan acceleration and to determine the exact date of the loan acceleration.

   vi.  A detailed list of the quantities that Apex had included on the loan balance or that it had capitalized in the loan balance including but not limited to: interest, attorney's fees, late charges, inspection charges, CRIM payments, advances and any other sum.

   vii.  Copy of the last 10 annual evaluations of the escrow account.

35.  Apex acknowledge receipt of the letter and on April 29, 2025 (Exhibit 2) replied to the QWR. In its letter it stated, unjustifiably that, 12 C.F.R. §1024.36(f) did not force it to comply with the QWR if it is duplicative information, confidential, irrelevant or overbroad and unduly burdensome. In its response Apex stated: "This includes information that a court has determined does not need to be disclosed. Throughout the course of litigation pending Civil Action No. K CD2016-0616 (504) with the Tribunal de Primera Instancia – Centro Judicial de San Juan, Apex Bank has provided or successfully objected to the same information you are now requesting. As such, Apex Bank is not required to provide that information." In addition, it only stated that it was the holder of the note

and provided a pay history of the loan. **That is the only information it provided of the 14 requests of the RFI.**

36. Mr. Casasnovas, a lawyer (retired) by trade, promptly replied to Apex answer with a QWR its first NOE on May 1st, 2025 (Exhibit 3).

    a. The NOE in essence stated that Act 184 was enacted to comply with the HARP and HAMP acts of the United States and provide relief to stressed debtors. Even though the internal regulations of the Act and the Act provide for confidentiality 12 U.S.C. §2616 states that the chapter did not annul, alter, of affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any state except to the extent that those laws are inconsistent with any provisions of the aforementioned chapter. Therefore, it is a inconsistency to not comply with federal law to abide to a state regulation.

    b. Secondly, he stated that the exemption of the regulation 1024.26(f)(1)(i) he stated that this was the first time he used a QWR therefore the exemption did not apply to him as he was using this mechanism for the first time.

    c. Thirdly, the information did not meet the 4 criteria of the official interpretation of 1024.36(f)(1)(ii).

    d. He also reminded Apex that there was no exception for pending litigation (Lucero v. Cenlar, 2015 WL 5024047 (W.D. Was Aug. 25, 2015).

37. Apex, replied to the NOE on June 2, 2025 (Exhibit 4) stating that its position had not changed from that set forth on April 29, 2025. It with this letter adjoined escrow analysis, reinstatements and payoffs related to Mr. Casasnovas RFI.

38. Mr. Casasnovas sent a Second NOE to Apex on the 10th of June, 2025.

    a. In this letter Mr. Casasnovas reiterated compliance with the RFI (see Exhibit 1). He made a distinction with Puerto Rico Rules of Civil Procedure and the use of a QWR. Stating that the first relates to discovery of any material not privy to privilege that is pertinent to the case. The second relates to information the borrower is requesting with respect to the

borrower's mortgage loan. The only limitation to a QWR is that it be sent to the servicer and that it is related to the mortgage loan.

    b. It reiterated that this was consumers first use of a QWR, therefore 1024.36(f)(1)(i) was irrelevant.

    c. We also stated that in Lucero, supra, it allowed attorney request information that was essentially the same to a previous request if the servicer never complied with the first.

    d. 2013 amendments to Regulation X stated that loss mitigation was a standard servicer duty, consequently making Puerto Rico's confidentiality clause in the Act unconstitutional.

39. Finally, Apex replied, late, to the NOE on July 1st, 2025 by simply stating it found no error.

40. Of the 14 items on the RFI, Apex, **<u>did not provide</u>** the following:

    a. Information of servicer of the note.

    b. Information regarding the securitization of the note (if it was) and asked to identify the trust, REMIC, SPV of the note holder.

    c. Information of the transfer or sale of the note from Oriental to Apex.

    d. The date that Oriental acquired the servicing of the account and who was the holder of the note.

    e. The loss mitigation file for the evaluation done to Mr. Casasnovas on August and November 2022.

    f. All documents that contained or set forth the minimum requirements for the approval of a loan modification for Mr. Casasnovas loan that were used for the determination of loss mitigation done in August 2022 and November 2022.

    g. To provide a detailed list of all loss mitigation alternatives that Apex offered during the period from August 2022 to November 2022, detailing which of those alternatives, Mr. Casasnovas was considered for and for which ones he wasn't. We also requested that Apex explain determined not to consider Mr. Casasnovas for the alternatives for which he was not considered.

h. Copy of the requirements for approval of all loss mitigation alternatives that Apex offered from August 2022 and November 2022.

i. Copy of all the calculus, evaluations, analysis or another method of evaluation that Apex employed for the evaluation of Mr. Casasnovas loan done between August 2022 and November 2022 that were done to sustain and reach the loss mitigation determination.

j. We requested they number and explain the reason, basis and analysis that were reached to deny the retention alternatives for Mr. Casasnovas loan.

k. It was also requested the following documents:

    i. Copy of the note and any modification agreement of said note (if there was);

    ii. Copy of the monthly statements of the loan sent to Mr. Casasnovas;

    iii. Copy of all note transfers sent to Mr. Casasnovas regarding the assignment of the note or administration;

    iv. Letter of the loan acceleration and to determine the exact date of the loan acceleration.

    v. A detailed list of the quantities that Apex had included on the loan balance or that it had capitalized in the loan balance including but not limited to interest, attorney's fees, late charges, inspection charges, CRIM payments, advances and any other sum.

    vi. Copy of the last 10 annual evaluations of the escrow account.

41. Plaintiff's QWR letters constituted "RFI" under Regulation X. The information sought (loan payment details, loss mitigation records, servicing policies, etc.) all pertained to the servicing of the loan – i.e., matters like how payments are collected and applied, management of escrow and loss mitigation, and other servicing duties. Apex was therefore obligated to comply with § 1024.36 in responding to each request. Apex failed to do so in several ways:

    a. **Failure to Provide Requested Information:** Apex did not provide much of the information that Plaintiff requested, even though the information was in Apex's control

and directly related to the loan. For example, Plaintiff asked for a complete payment history and loan balance breakdown, but Apex did not furnish a full history or the detailed breakdown of calculations. Plaintiff requested copies of loss mitigation evaluations and communications, but Apex withheld many of these. Plaintiff inquired about Apex's servicing policies or procedures that affected his loan, but Apex provided none of those materials. By failing to actually provide the information requested, Apex violated 12 C.F.R. § 1024.36(d)(1)(i), which required it to respond by providing the borrower with the requested information or conducting a reasonable search to locate that information.

b.  **Failure to Adequately Assert Information Unavailability**: Apex did not properly invoke the provision allowing a servicer to state that information is not available. Under § 1024.36(d)(1)(ii), if a servicer cannot obtain the requested info after a reasonable search, it must send a notice to the borrower explaining that the information is not available and the basis for that conclusion. In this case, Apex's responses did not say that it could not find or obtain the information; rather, Apex essentially refused to disclose information it had, for reasons outside the scope of the rule. Apex's letters cited legal objections (litigation and confidentiality) instead of stating that it conducted a search and found nothing. Thus, Apex failed to provide a valid notification of unavailability as contemplated by § 1024.36(d)(1)(ii). In essence, Apex's non-response was unjustified under the regulation.

c.  **Improper Use of Exceptions (Duplicative/Irrelevant/Confidential):** Regulation X lists narrow circumstances in which a servicer need not comply with the usual response requirements for information requests. These are found in § 1024.36(f)(1) and include: if the request is duplicative of a previous request already answered, if it seeks confidential, proprietary, or privileged information, if it is not directly related to the borrower's account (irrelevant), if it is overbroad or unduly burdensome, or if the request was sent over a year after servicing transfer or loan payoff . A servicer invoking any of these exceptions must

notify the borrower in writing within 5 business days of making that determination, stating the specific basis under § 1024.36(f) for its refusal.

42. In its responses, Apex effectively attempted to invoke at least two of these exceptions: "duplicative information" and "confidential/proprietary information", and implicitly "irrelevant information", as described in the factual background. However, Apex's invocation of these exceptions was unwarranted and did not meet the regulation's criteria:

   a. The requests were not duplicative within the meaning of § 1024.36(f)(1)(i). That provision applies when the borrower has previously requested the same information, and the servicer has already responded. Here, Plaintiff's QWR's, though multiple, either sought different information or were follow-ups seeking what Apex has not provided. Apex cannot claim an exception by pointing to discovery requests or mediation exchanges in a separate foreclosure case, as those are not prior RESPA RFI's that Apex responded to. Plaintiff's QWR's were made independently and for the first time as to the specific items sought. Thus, Apex had no valid basis to label them "substantially the same" as a prior request that was already answered.

43. The information sought was not genuinely confidential or privileged to excuse disclosure under § 1024.36(f)(1)(ii). The "confidential/proprietary" exception is intended for trade secrets, proprietary business information, or privileged communications (like attorney-client privileged material) that a servicer cannot reveal. Apex here claimed that mediation materials were confidential under the Courts internal regulation for mandatory mediation in foreclosure cases. But that is a court internal regulation mediation privilege, not a federally recognized privilege such as attorney-client privilege or work product. More importantly, Apex's federal obligations cannot be nullified by a state rule; as set forth in Count IV below, any state confidentiality law that conflicts with RESPA's disclosure requirements is preempted by federal law. Therefore, Apex's reliance on mediation confidentiality is not a valid ground under the federal regulation to refuse information.

The documents requested (e.g. data about Plaintiff's loan and loss mitigation) are fundamentally Plaintiff's own loan information and not the kind of proprietary secrets § 1024.36(f) aims to protect.

44. The requests were not irrelevant to Plaintiff's account. Section 1024.36(f)(1)(iii) allows a servicer to disregard requests for information that are not directly related to the borrower's mortgage account (for example, asking unrelated questions). Plaintiff's requests, however, squarely pertained to his loan and its servicing – payment records, loss mitigation decisions on his loan, etc. These are directly related to the account and the servicing thereof. Apex's blanket statement that some requests were not relevant is unfounded. Every category of information Plaintiff sought had a direct bearing on either the amount he owes, the way his account was handled, or his options regarding the loan. Thus, Apex had no valid "irrelevance" excuse under § 1024.36(f)(1)(iii).

45. To the extent Apex implied the requests were overbroad or burdensome – which Apex did not explicitly say in its letters but might attempt to argue – the Plaintiff's information requests were reasonable in scope, given the many years of loan history and the complexity of the loan's situation. Even if Apex found some parts burdensome, the regulation would require Apex to at least attempt to identify and respond to any portion of the request that was reasonable, which Apex failed to do.

46. In summary, none of the Regulation X exceptions justified Apex's failure to respond fully. Apex's form of response did not comply with § 1024.36(c)–(d), and its proffered reasons do not fall under § 1024.36(f)'s limited exemptions. Apex was required by law to either produce the information or give a valid explanation of unavailability; it did neither.

47. Upon information and belief, Apex Bank also failed to provide the required written notice within 5 days of its determination not to comply, as mandated by 12 C.F.R. § 1024.36(f)(2). Apex's actual response letters (sent around the 30-day mark) contained the refusals, but there is no indication Apex sent a separate prompt notice specifically invoking § 1024.36(f) within 5 days of receiving the QWR's. This technical violation underscores Apex's lack of adherence to the RESPA regulation's procedure.

48. Apex's violations of 12 C.F.R. § 1024.36 caused Plaintiff harm. As detailed earlier, Plaintiff suffered out-of-pocket costs, loss of important loan information, diminished ability to protect his interests in the property, and emotional distress, all of which are attributable to Apex's failure to comply with its information-request duties. These damages are recoverable under 12 U.S.C. § 2605(f) because Regulation X § 1024.36 is an obligation imposed by the CFPB "to carry out the consumer protection purposes" of RESPA, and a servicer's failure to comply with such regulation is treated as a violation of the statute itself. In other words, Apex's breach of the Regulation X requirements is actionable through RESPA's private right of action, and Plaintiff seeks relief accordingly.

49. The facts indicate that Apex's insufficient responses were not a one-time mistake but part of a broader pattern or practice (as alleged in Paragraph 15). Apex's repeated invocation of unfounded excuses to multiple information requests evidences a routine approach of noncompliance. Therefore, in addition to actual damages, Plaintiff seeks statutory additional damages for this pattern or practice of RESPA violations, as permitted under 12 U.S.C. § 2605(f).

50. Mr. Casasnovas has suffered damages for out-of-pocket expenses to the tune of:

    a. Attorney's fees: $4,850

    b. Messenger: $1,000

    c. Case expenses: (mail, copies, etc): $300.00

    d. Other expenses: Filing fees: $609; translation fees: $624.75

    e. Non-economic and/or emotional distress damages: $500,000.00

## C. Count III – Violation of Regulation X, 12 C.F.R. § 1024.35 (Failure to Properly Respond to NOE)

51. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

52. Regulation X at 12 C.F.R. § 1024.35 sets forth error resolution procedures that servicer must follow when a borrower submits a NOE. If a servicer receives a written notice from the borrower asserting that the servicer made a specific error in servicing the loan, the servicer must, within certain timeframes, investigate and respond. In general, for most errors, the servicer has 30 business days (with up to a 15-day extension if needed) to either: (A) correct the error and notify the borrower of the correction, or (B) conduct a reasonable investigation and provide a written notice to the borrower stating that no error occurred, with a detailed explanation of the reason and the borrower's right to request supporting documents . The servicer must also provide contact information for further assistance in that response. Certain errors (like failing to provide an accurate payoff balance) have shorter deadlines (7 business days) under the regulation, but those shorter periods are not at issue here.

53. Plaintiff's correspondence to Apex Bank alleged at least one category of servicing errors: failure to provide accurate information or properly handle loss mitigation. These fall under the enumerated errors in § 1024.35(b) and § 1024.35(b)(11) is a catch-all for "any other error relating to the servicing of a mortgage loan," under which errors in communicating loss mitigation options can be included (indeed, the CFPB's guidance treats providing inaccurate information about foreclosure alternatives as an error) . Thus, Plaintiff's complaints to Apex about these issues triggered Apex's duty under §1024.35 to investigate and correct the errors or to explain why Apex believed no error occurred.

54. Apex Bank violated the error resolution requirements (12 C.F.R. §1024.35) in multiple ways:

    a. **Failure to Conduct Reasonable Investigation and Provide Explanation**: If Apex believed that no error occurred or that the account was correct as previously stated, Apex needed to send a written explanation after investigating, providing specific reasons why it found no error, along with supporting details and an option for Plaintiff to request documents relied upon. Apex's responses, however, gave no such detailed explanation.

23

b. **Communication of Results:** Apex also did not provide the required notice to Plaintiff of the outcome of its error investigation. There is no indication Apex sent a separate "error resolution" letter distinct from its QWR response. The lack of a proper error resolution communication within 30 business days (or any extended period properly noticed) is a violation of § 1024.35(e). In effect, Apex never addressed the error notice at all in the manner the regulation contemplates.

c. **Procedural Violations:** Just as with information requests, Regulation X provides certain exceptions in § 1024.35(g) where a servicer need not investigate a claimed error (for example, if it's duplicative of a past error notice, or overbroad, or sent too late). Apex did not explicitly invoke any § 1024.35(g) exception in a proper notice to Plaintiff. To the extent Apex's failure to respond could be interpreted as relying on an exception, none legitimately applied. The errors Plaintiff raised were specific and had not been previously addressed by Apex, so they were not duplicative. They were directly related to servicing (not overbroad or outside the scope). And Plaintiff's notices were timely (the loan was still active and in foreclosure, so certainly within one year of any servicing transfer or payoff, satisfying § 1024.35(g)(3)). Thus, Apex had a duty to respond and failed to meet it.

55. Apex's failure to follow the error resolution procedures caused Plaintiff actual harm. The lapses contributed to Plaintiff's financial and emotional injuries as described earlier. Plaintiff had to incur costs (including legal fees) to try to get these errors addressed, and now through this lawsuit. All such costs and losses are a direct result of Apex's violations of § 1024.35. As stated, before Mr. Casasnovas has suffered damages for out-of-pocket expenses to the tune of:

a. Attorney's fees: $4,850

b. Messenger: $1,000

c. Case expenses: (mail, copies, etc): $300.00

d. Other expenses: Filing fees: $609; translation fees: $624.75

e. Non-economic and/or emotional distress damages: $500,000.00

24

56. As with Count II, Apex's violation of Regulation X's error resolution requirements is actionable via RESPA's enforcement provisions. The Dodd-Frank Act amendments to RESPA, specifically 12 U.S.C. § 2605(k)(1)(C) and (E), prohibit servicers from failing to take timely action to respond to borrower requests to correct errors and from failing to comply with regulations like § 1024.35 that are prescribed for consumer protection. Apex's conduct breached these statutory duties. Therefore, Apex is liable under 12 U.S.C. § 2605(f) for Plaintiff's actual damages and, because its behavior is part of a pattern or practice of noncompliance, for additional damages in an amount up to $2,000 as the Court deems appropriate.

### D. Count IV – Violation of the Supremacy Clause (U.S. Const. art. VI, cl. 2) – Preemption of Puerto Rico Law

57. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

58. The Supremacy Clause of the United States Constitution provides that federal law is "the supreme Law of the Land" (U.S. Const. art. VI, cl. 2), meaning that if a state law conflicts with or frustrates the purpose of federal law, the federal law prevails and the state law is preempted (rendered inoperative to the extent of the conflict). Congress, in enacting RESPA, included an express provision regarding the relationship of RESPA to state laws: under 12 U.S.C. § 2616, state laws are not superseded by RESPA unless they are inconsistent with RESPA, and then only to the extent of the inconsistency. Similarly, the CFPB's Regulation X states that state laws inconsistent with RESPA or Regulation X "are preempted to the extent of the inconsistency". In short, when federal law affirmatively requires certain disclosures or actions by a servicer, a state law or regulation cannot legally forbid or excuse non-compliance with those federal requirements.

59. Apex Bank has asserted that Puerto Rico's mandatory foreclosure mediation program (Act 184-2012 and related court rules) prohibits it from disclosing certain information (in particular, communications or documents from the mediation process) and that this state-regulation

confidentiality justified Apex's non-compliance with the QWRs. To the extent Puerto Rico law does indeed prevent a mortgage servicer from sharing information about loss mitigation discussions or evaluations with the borrower outside of mediation, that law stands in direct conflict with RESPA and Regulation X. Federal law required Apex to divulge information related to the servicing of Plaintiff's loan, including information about loss mitigation evaluations and communications, upon Plaintiff's QWR request. Apex's position is that Puerto Rico law forbade it from doing so. It is impossible for Apex to comply with both the federal requirement (disclose servicing information to the borrower) and the purported state requirement (keep mediation communications confidential). Therefore, <u>an operational conflict exists</u>: the state confidentiality rule, as invoked by Apex, **is inconsistent with the requirements and objectives of RESPA**.

60. By refusing to comply with the federal disclosure requirements based on a state law confidentiality rule, Apex effectively chose state law over federal law. Under the Supremacy Clause, Apex's first duty was to obey federal law, and any state law that would penalize or restrict Apex from fulfilling that federal duty is preempted. Apex's failure to provide the information thus violates the Supremacy Clause because Apex's actions give effect to an invalid state law defense against a federal mandate. In practical terms, Apex invoked a state confidentiality privilege to frustrate Plaintiff's federal rights under RESPA. But state law cannot nullify federal rights; Apex's conduct in adhering to the state confidentiality rule at the expense of RESPA compliance is unlawful.

61. Plaintiff seeks a declaratory judgment to resolve this conflict. Specifically, Plaintiff asks the Court to declare that any Puerto Rico law (statute, rule, or doctrine) that Apex Bank has relied upon to withhold information – such as the mediation confidentiality provisions – is preempted by federal law to the extent it purports to bar a mortgage servicer from responding fully to a RESPA Qualified Written Request. Such a declaration is necessary because Apex has raised the issue of state law preventing compliance. A declaratory ruling will make clear that Apex must comply with RESPA and Regulation X notwithstanding Puerto Rico's mediation confidentiality rules.

62. In connection with the declaratory relief, Plaintiff seeks <u>appropriate injunctive relief</u>. This includes an order prohibiting Apex from continuing to refuse compliance with Plaintiff's information requests based on the mediation confidentiality, and an affirmative injunction requiring Apex to immediately produce to Plaintiff all information and documents responsive to his QWR's that it previously withheld under a claim of state confidentiality. Because RESPA is a federal law enacted under Congress's authority and sets minimum servicer obligations, and because Congress intended to preempt conflicting state laws, Plaintiff is entitled to an order enforcing those obligations in full.

63. Granting such relief will uphold the Supremacy Clause by ensuring that federal law is given its intended effect. It will also clarify for the parties their rights and obligations going forward – namely, that Apex cannot hide behind Puerto Rico's confidentiality rules to shirk its federal duties. Instead, Apex must either comply with both laws (which it can do by providing the info to Plaintiff as federal law requires – there is no penalty in Puerto Rico law for disclosure to the borrower himself of his own loan info) or, if compliance with both is impossible, yield to the federal mandate.

64. Finally, it should be noted that Puerto Rico's mediation confidentiality provisions were designed to encourage open discussions during mediation by protecting those discussions from being used in court. Preemption here would not undermine that core purpose – Plaintiff is not seeking to use mediation statements against Apex's legal position in court; he is merely seeking to obtain the factual information about his loan that came to light or was discussed. In any event, even if there were a policy conflict, federal law prevails. Therefore, Apex's continued withholding of information under color of state law is illegal, and Plaintiff asks this Court to so declare and to order Apex's compliance with federal law.

### E. Prayer for Relief

**WHEREFORE**, Plaintiff Rafael Casasnovas Cortes respectfully requests that the Court enter judgment in his favor and grant the following relief:

a. **Declaratory Judgment:** A declaration that Defendant Apex Bank's conduct as described herein violated Plaintiff's rights under RESPA, 12 U.S.C. § 2605, and Regulation X (12 C.F.R. §§ 1024.35 and 1024.36). This includes a declaration that Apex's failure to respond properly to Plaintiff's QWRs and notices of error was unlawful. Additionally, a declaration that any Puerto Rico law or rule (including any mediation confidentiality provision) that conflicts with Apex's federal obligations to respond to QWRs is preempted by the Supremacy Clause and thus cannot excuse Apex's non-compliance with RESPA .

b. **Injunctive Relief:** An order compelling Apex Bank to fully respond to Plaintiff's outstanding Qualified Written Requests and Notices of Error in compliance with RESPA and Regulation X. This injunctive relief should require Apex, within a Court-imposed deadline, to produce all information and documents responsive to Plaintiff's requests (to the extent not already provided), and to correct any errors in Plaintiff's loan account that have been identified. The order should further enjoin Apex from withholding responsive information based on Puerto Rico's mediation confidentiality or any other state law ground that is inconsistent with federal requirements.

c. **Actual Damages:** An award of actual damages, in an amount to be proven at trial, resulting from Apex's RESPA violations, pursuant to 12 U.S.C. § 2605(f)(1)(A). This includes, but is not limited to, compensation for: Plaintiff's out-of-pocket costs (such as mailing costs and reasonable attorneys' fees incurred before and during this action to obtain the information), any excess charges or amounts paid on the loan due to Apex's errors, and damages for Plaintiff's mental anguish and emotional distress caused by Apex's failures. As stated, before: Mr. Casasnovas has suffered damages for out-of-pocket expenses to the tune of:

   i. Attorney's fees: $4,850

   ii. Messenger: $1,000

   iii. Case expenses: (mail, copies, etc.): $300.00

  iv. Other expenses: Filing fees: $609; translation fees: $624.75

  v. Non-economic and/or emotional distress damages: $1,000,000.00

d. **Statutory Damages:** An award of additional statutory damages as allowed by 12 U.S.C. § 2605(f)(1)(B) for Defendant's pattern or practice of noncompliance with RESPA's requirements. Plaintiff requests the Court to award up to $2,000 for each of Defendant's violations, or such aggregate amount as the Court deems just and appropriate, given the egregious and repeated nature of Apex's conduct.

e. **Attorneys' Fees and Costs:** An award of Plaintiff's reasonable attorneys' fees and costs incurred in connection with this action, as authorized by 12 U.S.C. § 2605(f)(3). Apex's violations forced Plaintiff to seek legal redress, and Plaintiff should be made whole for the expenses of enforcing his rights under the statute.

f. **Other Relief:** Such other and further relief as the Court deems just and proper, including equitable relief as may be necessary to redress Apex's misconduct or to deter such conduct in the future.

**JURY TRIAL DEMANDED.**

Plaintiff hereby demands trial by jury on all issues so triable.

**Dated:** August 11, 2025.

Respectfully submitted,



*P.O. Box 3825 Mayagüez, PR 00681*

*Tel: (787) 299-5935*

*Fax: (787) 417-8749*

*E-mail:* castellanos@lawyerspsc.com

**/S/Josué E. Castellanos Otero**

*Josué E. Castellanos Otero, Esq.*

USDC No. 301706

*Attorney for Plaintiff Rafael Casasnovas Cortes*